**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**INJAH TAFARI,**

                        **Plaintiff,**                    **9:11-cv-694[1]**
                                                          **(GLS/ATB)**

            **v.**

**HEATH BAKER et al.,**

                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Frederick Rench, PLLC          FREDERICK RENCH, ESQ.[2]
646 Plank Road
Suite 204
Clifton Park, NY 12065

InJah Tafari
Pro Se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

**FOR THE DEFENDANTS:**
_____

    [1] The Clerk is directed to docket this Memorandum-Decision and Order in the following
member cases: 9:11-cv-1342; 9:11-cv-1390; 9:11-cv-1422; 9:11-cv-1429; 9:11-cv-1446; 9:11-
cv-1447; 9:11-cv-1464; 9:11-cv-1476; 9:12-cv-269; 9:12-cv-662; and 9:12-cv-1062.  However,
unless otherwise noted, all docket citations refer to the lead case, 9:11-cv-694.  Moreover, the
court hereby rescinds its consolidation order and lifts the stay in each of the consolidated
cases.

    [2] By Order dated July 30, 2012, Magistrate Judge Andrew T. Baxter appointed
Frederick Rench to represent Mr. Tafari at the evidentiary hearing before this court.  (*See* Dkt.
No. 74.)  Throughout the process, and particularly at the hearing, Mr. Rench provided zealous,
exemplary advocacy on behalf of his client.  His willingness to do so provided an invaluable
service to his client, and to the court.  The court thanks Mr. Rench for his service.

HON. ERIC T. SCHNEIDERMAN          ADELE M. TAYLOR-SCOTT
New York State Attorney General    Assistant Attorney General
Albany Office
The Capitol
Albany, NY 12224

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff InJah Tafari commenced these twelve consolidated cases *pro se* under 42 U.S.C. § 1983 against defendants,[3] all agents of the New York State Department of Corrections and Community Supervision (DOCCS), alleging violations of his constitutional rights.  (*See, e.g.*, Am. Compl., Dkt. No. 15.)  Because of, *inter alia*, the imprecision of Tafari's allegations of imminent danger, which he apparently included in order to avoid paying the statutory filing fees, the court scheduled an evidentiary hearing to determine whether his claims were credible.  (*See* Dkt. No. 63 at

---

[3]  Heath Baker, Richard Adams, Amber Lashway, Michael Lira, Gerard Otis, David Rock, John Sherhan, Dr. Carl Koenigsmann, Lucien Leclaire, Brian Fishcer, Donald Quinn, Theodore Zerniack, Matthew Ranieri, Jerry Herbert, David Bilow, Lawrence Hopkinson, Julia Gordon, Albert Prack, Jason Ferrick, Brian Bush, Matthew Welch, Donald Uhler, Diana Mullen, William Allen, Steven Racette, Dale Artus, Richard Roy, Keven Smith, R. Murphy, Maureen Bosco, C.O. Smith, C.O. Kemp, C.O. Wright, Kalyana Battu, Joseph Bellnier, Michael Sheahan, William Chase, Roy Hastings, Donald Wood, Stanley Tulip, Martha Sturgen, Jason Rushlaw, Geraldine Wilson, Scott Santamore, Kevin Premo, Nathan Bateman, Trudy Boyea, Darin Cook, Craig Mainville, Bruce Bogett, William Hungerford, Candy Atkinson, Thomas Quinn, Brad Reif, Paul Gokey, Timothy Ramsell and George Waterson.

4-5.)  For the reasons articulated below, the court, having considered the documentary and video evidence, testimony of the witnesses at the hearing, supplementary submissions and the record as a whole, finds that Tafari's claims of imminent danger of serious physical injury are incredible. It follows that unless he pays the statutory filing fee in each of his cases, they will be dismissed.

## II. Background

## A.    Allegations of Imminent Danger[4]

In addition to the specific allegations of wrongdoing in each case, the majority of Tafari's Complaints contain a section entitled "Imminent Danger of Serious Physical Injury," in which he claims that he was assaulted by "Upstate Staff" on the following dates: April 20 and 24, 2009, February 18, 2010, July 23, 2010, December 21, 2010, January 12, 2011, March 31, 2011, July 26, 2011, February 15, 2012, and May 5, 2012.  (*See, e.g.*, Am. Compl. ¶ 13, Dkt. No. 10, Attach. 1, 12-cv-269.)

_____

[4] Because the inquiry is narrow here, the court confines it recitation of Tafari's allegations to those that, if substantiated, would presumably demonstrate that Tafari was in imminent danger of serious physical injury at the time he filed his Complaints.  It follows that the allegations are drawn from each of Tafari's Complaints and presented in a light most favorable to him.  And, even though Tafari is an experienced litigant in federal court, the court nonetheless construes his *pro se* Complaints liberally.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

1.      *11-cv-694: Tafari v. Baker et al.*[5]

In retaliation for filing lawsuits against her, Nurse Practitioner Lashway told Nurse Baker and Dr. Adams to "discontinue" the medical treatments Tafari needs for his stomach condition, receding gum lines, photophobia vision, bowenoid papulosis, Raynaud's Disease, and various ailments in his shoulder, thumb and lower back.  (*See* 2d Am. Compl. ¶¶ 8, 16, Dkt. No. 50, Attach. 1.)  Nurse Baker reiterated this threat, and by February 10, 2011, all of Tafari's treatments were discontinued.  (*See id.* ¶¶ 9-10.)  Despite filing 250-plus complaints about the denial of medical treatment, commissioners Fischer and Koenigsmann refused to "get[] involved."  (*Id.* ¶ 15.)  Finally, Tafari alleges that Nurse Baker wrote false misbehavior reports, physically assaulted him on July 23, 2010, April 17, 2011 and September 2, 2011, and threatened him with physical harm on the following dates: November 13, 20 and 27, 2011; December 4, 18 and 25, 2011; and January 8 and 22, 2012.  (*See id.* ¶¶ 18-22.)

2.      *11-cv-1342: Tafari v. Rock et al.*[6]

---

[5] On April 10, 2012, Tafari filed a motion to amend his Complaint for a second time. (*See* Dkt. No. 50.)  Because the Second Amended Complaint purportedly demonstrates a pattern of imminent danger, the motion is granted.  (*See id.* at 2.)

[6] On May 17, 2012, Tafari filed a motion to amend his Complaint.  (*See* Dkt. No. 11, 11-cv-1342.)  For the reasons stated above, (*see supra* note 5), the motion is granted.

4

Tafari contends that on December 12 and 26, 2009, January 8, 2010 and February 6, 2010, Officer Bilow threatened him.  (*See* Am. Compl. ¶¶ 8-13, Dkt. No. 11, Attach. 1, 11-cv-1342.)  Although Tafari reported each of these threats, Captain Zerniak, along with Deputy Superintendent Otis and Superintendent Rock, refused to protect him.  (*See id.*)  Furthermore, on February 18, 2010, officers Bilow, Hopkinson and Herbert assaulted him while he was restrained in a van on the way to Ulster County Supreme Court.  (*See id.* ¶¶ 14-17.)  As a result of the assault, Tafari suffered injuries to the head, face, chest, and arms.  (*See id.* ¶ 17.)  When the van returned to Upstate, Tafari was taken to the infirmary and photographed with a mask on, but was not initially treated by either Deputy Superintendent Otis or Nurse Gordon, both of whom observed his injuries.  (*See id.* ¶¶ 18-20.)  However, five days later, Tafari received treatment for a broken nose, broken ribs, black eyes, and lacerations of the head, face, chest, stomach, arms, legs and shoulders.  (*See id.* ¶ 21.)  Moreover, Tafari avers that Officer Bilow threatened him on July 27, 2010 and January 1, 2011.  (*See id.* ¶¶ 26-27.)

   3.   *11-cv-1390: Tafari v. Uhler et al.*

On March 31, 2009, Deputy Superintendent of Safety and Security

5

Donald Uhler instructed Upstate staff to beat Tafari in retaliation for filing lawsuits against him. (Compl. ¶ 4, Dkt. No. 1, 11-cv-1390.)  Furthermore, on April 24, 2009, Tafari was escorted to the back of the infirmary, where Sergeant Hungerford watched while officers Tulip, Cook, Bogett, Mainville and Reit punched him in the back of the head and beat him. (*See id.* ¶¶ 5-7.)  Thereafter, Officer Atkinson, who admitted to watching the assault, returned Tafari to his cell, denied him medical treatment for his injuries and told him to drop the lawsuit against Deputy Uhler. (*See id.* ¶¶ 8-9.)  Moreover, that same day, Lieutenant Quinn placed Tafari on a restricted diet for seven days, apparently as a consequence of the beating, and told him that the restriction would continue "for a very long time" unless he dropped his lawsuit against Deputy Uhler. (*Id.* ¶ 10.)  Finally, Tafari avers that Deputy Uhler threatened him on November 21, 2011.[7] (*See id.* ¶ 12.)

 4. *11-cv-1422: Tafari v. Uhler et al.*[8]

After being transferred to another cell at the behest of Deputy Uhler, Tafari was gang assaulted by several officers, including Santamore, Premo

---

[7] Tafari repeats this identical allegation in several of his subsequent Complaints. (*See, e.g.*, Compl. ¶ 10, Dkt. No. 1, 11-cv-1422.)  In the interest of brevity, it will not be repeated in each case summary.

[8] On May 18, 2012, Tafari filed a motion to amend his Complaint. (*See* Dkt. No. 9, 11-cv-1422.)  For the reasons stated above, (*see supra* note 5), the motion is granted.

and Bateman—who was also "using racial slurs" during the assault—while Counselor Boyea stood outside the cell encouraging them.  (*See* Am. Compl. ¶¶ 4-6, Dkt. No. 9, Attach. 1, 11-cv-1422.)  Though Tafari suffered broken ribs, black eyes, swollen face, laceration on his head, and bruises and abrasions all over his body, Nurse Baker denied his request for medical treatment.  (*See id.* ¶¶ 7-8.)

     5.     *11-cv-1429: Tafari v. Zerniak et al.*

Following his tier hearing on December 16, 2010, Tafari was assaulted by officers Gokey, Ramsdell and Zerniak, while Deputy Uhler observed and encouraged the assault.  (*See* Compl. ¶ 4, Dkt. No. 1, 11-cv-1429.)  Despite suffering a bloody discharge from his nose and left ear, as well as bruises on his legs, chest, stomach, arms, face, back and head, Tafari's subsequent request for medical treatment was denied by Nurse Waterson and Dr. Adams.  (*See id.* ¶¶ 5-7.)

     6.     *11-cv-1446: Tafari v. Gettman et al.*

While being escorted to the Wende Correctional Facility on July 26, 2011, Sergeant Gettmann ordered Officer Rushlow to assault Tafari.  (*See* Compl. ¶ 4, Dkt. No. 1, 11-cv-1446.)  Rushlow complied and "began punching [him] in the arms, chest, stomack [sic] and face/head."  (*Id.* ¶ 5.)

During the "beating," Officer King, the third officer on the transport, encouraged Rushlow to "whip [Tafari], so he can drop that lawsuit against DSS. Uhler." (*Id.* ¶ 6.)  Sergeant Gettman echoed this statement, and further admitted that Deputy Uhler "ordered this beating." (*Id.* ¶ 7.)  When Tafari returned to Upstate, he requested, but was denied, medical treatment by Nurse Wilson. (*See id.* ¶ 8.)  Relatedly, Sergeant Gettman repeated his threat when he transported Tafari to Auburn Correctional Facility on October 17, 2011. (*See id.* ¶ 11.)

       7.    *11-cv-1447: Tafari v. Bellnier et al.*

During their infirmary rounds on April 20, 2009, Tafari informed superintendents Bellnier and Sheahan of the threats Deputy Uhler made against him, and asked them for protection. (*See* Compl. ¶ 5, Dkt. No. 1, 11-cv-1447.)  After his request was denied, Officer Tulip ordered Tafari to "the boss chair"; when he got off of it, he was assaulted by officers Wood, Hastings, Tulip and Chase, as well as superintendents Sheahan and Bellnier. (*Id.* ¶¶ 6-8.)  Although he suffered broken ribs, a head laceration and bruises over the entirety of his body, Tafari was denied medical treatment by Nurse Sturgen. (*See id.* ¶ 9.)

       8.    *11-cv-1464: Tafari v. Bosco et al.*

While on suicide watch at Great Meadow OMH in April 2009, FPA Bosco ordered the officers observing Tafari to assault him.  (*See* Compl. ¶ 6, Dkt. No. 1, 11-cv-1464.)  Officers Smith, Kemp and Wright, along with Specialist Battu, complied.  (*See id.* ¶ 7.)  They entered Tafari's cell, injected a substance in his buttocks, and proceeded to kick, stomp and punch him "all over his body."  (*Id.*)  Further, Specialist Battu, who later denied Tafari medical treatment, threatened him with additional assaults unless he dropped his lawsuit against Deputy Uhler.  (*See id.* ¶¶ 7-8.)

   9.     *11-cv-1476: Tafari v. Smith et al.*

In a related incident to the one described in 11-cv-1464, Tafari claims that he was assaulted on April 13, 2009 by Lieutenant Smith, Captain Murphy and other unknown officers, after Superintendent Rock, who was standing outside of the cell, made retaliatory threats for Tafari's pending suit against Deputy Uhler.  (*See* Compl. ¶¶ 6-7, Dkt. No. 1, 11-cv-1476.)  Upon his return to Upstate, "all the named defendants" denied him care for the injuries he sustained.  (*Id.* ¶ 8.)

   10.    *12-cv-269: Tafari v. Allen et al.*[9]

---

[9]  On May 16, 2012, Tafari filed a motion to amend his Complaint.  (*See* Dkt. No. 10, 12-cv-269.)  For the reasons stated above, (*see supra* note 5), the motion is granted. Relatedly, the court received and reviewed both the Report-Recommendation and Order (R&R) filed by Judge Baxter on May 9, 2012, and Tafari's objections to that R&R.  (*See* Dkt. Nos. 8-

9

In the course of his transfer from Clinton Correctional Facility to Upstate on March 31, 2009, Tafari, who was sitting in the van in full restraints, was assaulted by Lieutenant Allen.  (*See* Am. Compl. ¶ 8, Dkt. No. 10, Attach.1, 12-cv-269.)  As Allen punched and yelled at Tafari, superintendents Artus, Racette and Uhler cheered him on.  (*See id.*)  When Allen was finished, Racette punched Tafari in the face, and finally, Uhler joined in, grabbing Tafari by the hair and smacking him in the face.  (*See id.* ¶¶ 9-10.)  Tafari later sought medical attention, but was denied by Nurse Practitioner Lashaway.  (*See id.* ¶ 11.)

    11.   *12-cv-662: Tafari v. Ferrick et al.*[10]

On September 22, 2011, officers Ferrick, Bush and Welch ordered Tafari out of his cell for a frisk; Tafari complied and was moved to the "lower floor holding cell."  (Am. Compl. ¶¶ 5-6, Dkt. No. 7, Attach. 1, 12-cv-662.)  When he returned to his cell, the three officers "gang assaulted" Tafari and made various racial slurs while doing so.  (*Id.* ¶ 7.)  After leaving the cell, Ferrick removed Tafari's restraints and told him that if he did not

---

10, 12-cv-269.)  Although the R&R is well-written and legally sound, the court's decision to hold an evidentiary hearing obviates the need to adopt Judge Baxter's recommendations.  It follows that the R&R is, at this juncture, moot.

   [10]  On May 21, 2012, Tafari filed a motion to amend his complaint.  (*See* Dkt. No. 7, 12-cv-662.)  For the reasons stated above, (*see supra* note 5), the motion is granted.

drop the lawsuit against Deputy Uhler, things would get worse.  (*See id.* ¶ 8.)  Tafari subsequently sought treatment for his "fresh" injuries, but Nurse Mullen refused, stating that he would not be cared for until he discontinued the lawsuit against Deputy Uhler.  (*Id.* ¶ 9.)

      12.    *12-cv-1062: Tafari v. Bilow et al.*

As he entered the visiting room on April 28, 2012, Officer Ramsdell threatened Tafari with physical harm unless he dropped the lawsuit against he and Deputy Uhler.  (*See* Compl. ¶ 4, Dkt. No. 1, 12-cv-1062.)  Shortly thereafter, Tafari was ordered out of the visiting room and into the strip/frisk room by Officer Bilow and Sergeant Herbert for "using a SHU pen to write down legal notes."  (*Id.* ¶ 5.)  The officers proceeded to verbally harass him during the search, and after it was complete, Bilow punched Tafari in the right side twice, while threatening additional harm unless he dropped his lawsuits against Deputy Uhler.  (*See id.* ¶¶ 5-6.)  At the completion of the visit, Tafari was again taken to the strip/frisk area.  (*See id.* ¶ 7.)  Bilow ordered him against the wall, and after he bent over to be searched, stuck his fingers in Tafari's rectum, pumping them four or five times.  (*See id.*)  When Bilow finished, he, along with Ramsdell and Herbert, assaulted Tafari.  (*See id.*)  After returning to his cell, Tafari unsuccessfully requested

treatment from Nurse Waterson.  (*See id.* ¶ 8.)  Tafari was eventually examined by Dr. Schoyer, who, among other things, conducted an anal exam.  (*See id.* ¶ 9.)  Just over one month later, Bilow again threatened Tafari, and promised to retaliate against him for reporting the February 2010 and April 2012 incidents.  (*See id.* ¶ 12.)

## B.   Procedural History

The twelve consolidated cases, which involve incidents that occurred over a three-year period from April 2009 to June 2012, were all commenced between June 2011 and July 2012.  (*See supra* Part II.A.)  On January 4, 2012, defendants moved to revoke Tafari's *in forma pauperis* (IFP) status, arguing that he was subject to the three strikes provision of 28 U.S.C. § 1915(g).  (*See generally* Dkt. No. 42.)  While that motion was pending, Tafari not only filed two separate motions for injunctive relief—the first in May 2012 in twelve cases, and the second in June 2012 in seventeen cases, (*see* Dkt. No. 61 at 5)—but also sought to amend five of his Complaints, (*see supra* Part II.A.)  In light of Tafari's extensive history of vexatious litigation, the fact that he was subject to the three strikes provision at the time he commenced each of the consolidated cases, the imprecision in his allegations of imminent danger, and the pending motion

to revoke his IFP status, the court scheduled an evidentiary hearing to determine the veracity of Tafari's claims of imminent danger.  (*See* Dkt. No. 42; Dkt. No. 63 at 4-5.)

Recognizing the need to afford Tafari a full and fair opportunity to substantiate his claims, the court permitted both parties to call live witnesses, and to submit *any other evidence, in any form*—including affidavits, declarations, disciplinary records, incident reports and/or medical records—that was relevant to the question of imminent danger.  (*See* Dkt. No. 63 at 5-6.)  To this end, Tafari filed requests for videotapes, (*see* Dkt. Nos. 66, 67, 70, 82, 88), his complete grievance file from Clinton and Upstate Correctional Facilities, (*see* Dkt. Nos. 79, 87), and more broadly, all records relevant to his Complaints, (*see, e.g.*, Dkt. No. 86).  He also provided proposed witness lists, (*see* Dkt. Nos. 69, 71, 83), sought—and received—representation for the hearing, (*see* Dkt. Nos. 72, 74), and submitted exhibits and declarations in support of his claims, (*see* Dkt. Nos. 89-90.)  Similarly, defendants filed several exhibits, including the relevant portions of Tafari's medical records and grievances from Upstate, (*see* Dkt. Nos. 75-78, 97-99), witness lists, (*see* Dkt. Nos. 73, 96), a declaration from Dr. Adams, (*see* Dkt. No. 92, Attach. 1), and the requested, available

13

videotapes, (*see id.*, Attachs. 2-4).

The court further ordered the parties to participate in a series of pre-hearing conferences with Magistrate Judge Andrew T. Baxter, the purpose of which was generally to ensure that the scope of the hearing remained focused on the question of imminent danger. (*See* Dkt. No. 63 at 6-7.) Over the course of the conferences,[11] Judge Baxter not only afforded both parties latitude in discovering evidence, but also ensured that Tafari was given sufficient time to consult with his attorney. (*See generally* Dkt. Nos. 65, 72.) By that same token, Judge Baxter rejected Tafari's attempt to obtain his complete grievance file from Clinton and Upstate, (*see* Dkt. No. 79),[12] denied his request to call certain medical experts, and, given, among other things, security concerns, limited the number of live, inmate

---

[11] Though not assigned docket numbers, the docket reflects several entries by Judge Baxter that further explicate his decisions with respect to the evidentiary hearing.

[12] In a letter received September 28, 2012, Tafari again demanded that defendants turn over evidence that his former-counsel unsuccessfully sought during the pre-hearing conferences. (*See generally* Dkt. No. 108.) In short, the evidence Tafari seeks is irrelevant to the question before the court, as it relates to a period which precedes the events underlying the Complaints. (*See id.*) Although Tafari is clearly seeking to demonstrate a pattern of misconduct, (*see, e.g.*, Am. Compl. ¶ 17, 12-cv-269), evidence from facilities other than Upstate, and/or which precedes the relevant time period here, has no bearing on whether Tafari was in imminent danger when he filed any of his Complaints. Equally so was the proposed testimony from the various medical experts Tafari identified, (*see* Dkt. No. 83 at 1-2), which became wholly immaterial after defendants filed an uncontested affidavit from Dr. Adams, (*see* Dkt. No. 92, Attach. 1). Tafari received this affidavit prior to the August 30, 2012 pre-hearing conference, and still declined to call Dr. Adams as a witness.

witnesses at the hearing, (*see generally* Dkt. Nos. 91, 94).[13]

The court conducted the hearing on September 5 and 6, 2012, during which it heard testimony from the following witnesses: Imhotep H'Shaka, Eugene Sidney, Steve Coleman, James Salamone, Raphael Thompson, Ralph Bucky Phillips via David Szalda, InJah Tafari, Stephen Weishaupt, Brandi White, Nancy Smith and Donald Uhler.  (*See generally* Tr.[14] at 12-388.)  At the close thereof, the parties were granted an additional two weeks to supplement, and settle, the record.  (*See id.* at 392:18-393:22.)  Both did so, as Tafari filed multiple declarations, an objection, and a motion to amend all of his Complaints,[15] (*see* Dkt. Nos. 102, 105, 107, 109, 112, 113, 114, 116, 117[16]), and defendants submitted an affidavit from Donald

_____

[13]  Notwithstanding Tafari's inability to call all of the inmates he identified, the court received—and has now considered—all of their declarations.  (*See* Dkt. No. 90.)

[14]  Page references preceded by "Tr." refer to the transcript of the evidentiary hearing conducted on September 5 and 6, 2012.  (*See* Dkt. Nos. 110-11.)

[15]  Because the court previously rejected an identical motion at the start of the hearing, (*see* Tr. at 9:3-10:19; Dkt. No. 107), it suffices to say that Tafari's arguments in support of his motion remain unpersuasive.  As such, the motion is denied.  Furthermore, Tafari's request to file a Third Amended Complaint in 11-cv-694 is also denied, (*see* Dkt. No. 117), as his claim that he is *now* urinating blood, assuming that it is true, is too far removed from the operative time period in that case—*i.e.*, June 2011, when Tafari filed his Complaint.

[16]  Since the close of the proof in this matter, Tafari has not only filed hundreds of additional pages of records, but has also insisted that his former counsel turn over documents in his possession.  (*See* Dkt. Nos. 108, 109, 112-14, 116.)  Additionally, he has repeatedly requested that he be given additional time to file a response after he reviews the supplementary filings, (*see, e.g.*, Dkt. No. 113, 116), many of which he has apparently already reviewed, (*see generally* Dkt. Nos. 114, 115).  These requests are denied.  From the outset,

Uhler, with attached compact discs and grievances to refute claims Tafari

made for the first time at the hearing, (*see* Dkt. No. 104).  With the record

settled, the court terminated attorney Rench's representation.  (*See* Dkt.

No. 106.)

### III.  Legal Standard

Under 28 U.S.C. § 1915(g), the so-called three strikes provision, a

prisoner-plaintiff may not file a civil action or appeal with the benefit of IFP

status if, "on [three] or more prior occasions, while incarcerated or detained

in any facility, [he] brought an action or appeal in a court of the United

States that was dismissed on the grounds that it is frivolous, malicious, or

fail[ed] to state a claim upon which relief may be granted."[17]  However, a

narrow exception exists that permits such filings provided that "the prisoner

is under imminent danger of serious physical injury."  *Id.*; *see Pettus v.*

*Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009).  This exception is a safety

---

this hearing was intended solely to adduce evidence, not argument.  With respect to the former, which Tafari had his chance to present, the court is more than able to conduct an independent review of the testimony, documents and videos it received, and pass judgment on them without argument from either party.  Any further filings are simply unnecessary. Moreover, the court is wholly unpersuaded by Tafari's demand for additional video footage from incidents that purportedly occurred in October 2012.  (*See* Dkt. No. 113 at 2-3).  These have no bearing on the issue before the court, and thus, that request is also denied.

[17]  Importantly, if a District Court determines that IFP status was improvidently granted to a prisoner, it may be revoked.  *See, e.g.*, *McFadden v. Parpan*, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998).

valve for a prisoner who is otherwise barred from filing IFP.  *See Malik v. McGinnis*, 293 F.3d 559, 563 (2d Cir. 2002).  To qualify for the exception, the danger must be present at the time the plaintiff files his complaint.  *See id.*  Although allegations of "ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury," *Brown v. Johnson*, 387 F.3d 1344, 1350 (11th Cir. 2004) (internal quotation marks omitted), may qualify, "a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed."  *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (citations omitted).

In reviewing the allegations of physical harm, the court need not attempt to "'fine tune what is serious enough to qualify for the exception.'" *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (quoting *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (internal quotation marks omitted)).  But courts are not required to "blindly accept a prisoner's allegations of imminent danger" either.  *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010).  Indeed, where the allegations of imminent danger are

challenged,[18] the court must "determine whether they are credible." *Id.*; *accord Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir. 1997), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001). To do so, the court "may rely upon evidence supplied by sworn affidavits or depositions, or, alternatively, may hold a hearing." *Gibbs*, 116 F.3d at 86-87. Ultimately, whether the plaintiff affirmatively substantiates his claim of imminent danger, or the defendant disproves the claim is of no moment. Though the court's inclination is that the burden should be on the plaintiff, as it is he who has the initial duty under Fed. R. Civ. P. 11(b), assigning the burden of proof should not cloud the focus of the inquiry—*i.e.*, to determine whether the plaintiff has stated a credible claim of imminent danger that excuses payment of the filing fee.

## IV. <u>Findings of Fact</u>

The following represents the court's findings of fact. In the interest of clarity, it first discusses the testimony of the live witnesses in the order they appeared at the hearing, and then incorporates all of the credible, relevant

---

[18] Because section 1915 was enacted "to give district courts greater power to protect their dockets from meritless lawsuits," the court is permitted to raise the issue *sua sponte*. *Harris v. City of N.Y.*, 607 F.3d 18, 23 (2d Cir. 2010). It follows that while it will usually be the defendant who raises the challenge to the veracity of the plaintiff's claim of imminent danger, the court may also do so.

evidence of record to provide detailed findings with respect to each of the alleged incidents.[19]

## A.   Witnesses

As a general matter, the court carefully observed each witness as he/she testified at the hearing.  Among other factors, it took note of the witnesses' demeanor, manner and tone of voice on the stand, their recollection of the incidents about which they testified, their motive for testifying, if any, and the extent to which, if at all, the witnesses' testimony was either supported or contradicted by other evidence in the record.  In so doing, the court, for the reasons articulated below, finds that the testimony of Tafari's witnesses, including Tafari himself, was unreliable, belied by other evidence of record, and likely crafted by Tafari for the purpose of furthering his litigation.[20]  On the contrary, the testimony by defendants' witnesses was not only reliable, but also corroborated by documentary and video evidence.  For the reasons that follow, the court finds that Tafari's version of the events in question, as testified to by he and his witnesses, is

---

[19] As the court ruled at the hearing, the record includes all of the parties' submissions. (*See* Tr. at 392:2-17.)

[20] While a number of Tafari's witnesses likely perjured themselves, those that did not only avoided doing so by refusing to provide detailed accounts of what they claimed to see or hear.

wholly incredible, and, instead, fully credits the testimony provided by defendants' witnesses.

### 1. Imhotep H'shaka

H'shaka is currently an inmate at Upstate who has known Tafari for over four years. (*See* Tr. at 12:6-13:2, 21:2-4.)  In advance of the hearing, H'shaka—at Tafari's request—prepared a declaration on July 5, 2012, which was provided to him to "refresh [his] recollection" of specific dates. (*See id.* at 13:21-14:3, 26:1-27:14; Dkt. No. 90 at 21-22.)  Though he claims to have seen Tafari mistreated by corrections officers at Upstate "numerous times," he was only able to testify about three incidents.  (Tr. at 13:3-20:8.)

The first incident H'shaka saw occurred on December 16, 2010, when he was returning from a tier hearing.  (*See id.* at 14:21-15:9, 22:5-15.)  H'shaka testified that he witnessed Tafari being "assaulted by guards," namely officers Gokey and Ramsdale.  (*Id.* at 15:5-13.)  He further stated that he overheard the guards tell Tafari to "drop the lawsuit."  (*Id.* at 15:22-16:1.)  Albeit unable to specify which lawsuit it was, H'shaka stated that it was connected to Deputy Uhler, who he was clearly familiar with. (*Id.* at 16:2-23.)

20

H'Shaka next discussed an incident that he heard, but could not see, on February 18, 2010.  (*See id.* at 17:6-19:6.)  That morning, sometime between 7:00 and 8:45 a.m., H'shaka heard someone—whose voice he did not recognize at the time—pleading for help.  (*See id.* at 18:1-6.)  In response to the pleas, other voices, which H'shaka could not identify either, used racial slurs and made comments about dropping a lawsuit.  (*See id.* at 18:8-20.)  H'shaka testified that he later learned the person begging for help was Tafari, though he still did not know who the aggressors were.[21] (*See id.* at 18:20-19:6.)  Finally, H'shaka stated that he overheard Tafari being "roughed up" on the day he arrived at Upstate.  (*Id.* at 19:7-20:6.)

Despite the recency of his declaration, and the fact that he reviewed it on the stand, H'shaka's testimony was inconsistent with his declaration. For example, he testified that he only knew the names of two of the guards who allegedly assaulted Tafari on December 16, 2010, but in his declaration, he mentions, by name, officers Gokey and Ramsdell, Captain

---

[21] Tafari submitted a declaration from Alton Hutchinson that is suspiciously similar to H'shaka's declaration.  (*Compare* Dkt. No. 90 at 23, *with id.* at 21-22.)  Given this similarity, and Hutchinson's lack of first hand knowledge of the incident, (*see id.* at 23), the court finds this declaration to be unreliable.  So too are the declarations of Woodrow Flemming, (*see id.* at 14-16), Darnell Weaver, (*see id.* at 17-18), and Eddie Carrasco, (*see id.* at 32), as each lacks a sufficient basis of personal knowledge to make such statements, and/or is insufficiently specific to warrant consideration.

Zerniak and Deputy Uhler.  (*Compare id.* at 15:10-11, *with* Dkt. No. 90 at 22.)  Above all, the inability to recall that Deputy Uhler was present is telling, as H'shaka's declaration not only places him at the scene, but also purports to recount specific statements Uhler made.  (*See* Dkt. No. 90 at 22.)  Furthermore, in his declaration, H'shaka claimed that he was being "escorted to a tier hearing" when he observed the assault, however, on the stand, he stated that he just completed his hearing.  (*Compare id.* at 22, *with* Tr. at 22:10-12.)  And while the court is skeptical of H'shaka's inability to identify Tafari's voice on the morning of February 18, 2010, (*see id.* at 18:4-6), his statement that he learned that it was Tafari who was screaming that afternoon is nevertheless inconsistent with his testimony, in which he stated that he learned it was Tafari the next day.  (*Compare id.* at 26:6-16, *with* Dkt. No. 90 at 22.)  Finally, H'shaka's familiarity with Tafari's litigation history, including the specifics of his individual Complaints, further bolsters the court's suspicion that H'shaka was not testifying on the basis of his own recollection.  (*See* Tr. at 26:17-28:9.)

These inconsistencies, coupled with the court's observations of H'shaka and its consideration of the record as a whole, provides more than a sufficient basis to discredit the entirety of H'shaka's testimony.  As such,

the court rejects both his testimony and declaration.

### 2.   *Eugene Sidney*

Sidney arrived at Upstate shortly after Tafari, and has known him for approximately three years.  (*See id.* at 33:8-21.)  Although his declaration, which, like H'shaka's, was prepared in July 2012, stated that he witnessed corrections officers and Deputy Uhler threaten Tafari about his pending lawsuits, (*see* Dkt. No. 90 at 33-34), Sidney testified that the threats emanated from the officers' dislike of Tafari's "special privileges," (Tr. at 35:14-16, 37:12-15).  With the exception of generalizations and references to unknown records and videos to corroborate his testimony, Sidney could not recall a single incident that supports Tafari's allegations.  (*See generally id.* at 33:6-43:1.)  Despite being explicitly asked about physical evidence, (*see id.* at 42:12-13), Sidney purposely avoided repeating the statement he made in his declaration in this regard, (*see* Dkt. No. 90 at 34).

In short, based on his demeanor, mannerisms, and general uneasiness on the stand, the court finds Sidney's testimony untrustworthy. His declaration, which was prepared just two months before the hearing, is similarly unreliable, as it contains neither dates of the alleged misconduct, nor the names of any corrections staff, other than Deputy Uhler, who

threatened Tafari.  (*See id.* at 33-34.)  Accordingly, the court rejects this

evidence as well.

    *3.   Steve Coleman*

    Beginning in 2008, Coleman was housed at Upstate, but he has

known Tafari since the 1980s.  (*See* Tr. at 45:8-18.)  He too prepared a

declaration in July 2012.  (*See* Dkt. No. 90 at 24-25.)  However, despite

being provided a copy of his declaration at the outset of his testimony, (*see*

Tr. at 46:3-47:7)—which includes a footnote[22] with both the dates of the

incidents he observed and corrections staff involved, (*see id.*)—Coleman

repeatedly stated that he could not remember details, such as dates or

names, (*see, e.g., id.* at 47:16-17, 48:11-13, 50:19-21).  Nevertheless,

Coleman went on to testify about the following events: (1) a time he

observed that Tafari was "beat up real, real bad" when he returned from a

court trip; (2) an incident following a cell search where Counselor Boyea

was present; (3) two occasions where Nurse Baker slammed Tafari's hand

---

    [22] Notably, the footnote in Coleman's declaration is nearly identical to the one Samuel Robinson, another inmate who submitted a declaration on Tafari's behalf, used in his. (*Compare* Dkt. No. 90 at 24-25, *with id.* at 26-27.)  While this may appear benign, the court cannot overlook the fact that two separate individuals were able to recall events at least one year after they occurred, both decided to use a footnote to describe them, and in doing so, recounted the incidents in the exact same order.  (*See id.*)  More importantly though, there is other evidence in the record that rebuts these assertions.  (*See infra* Part IV.B.)  Thus, Robinson's declaration is also disbelieved.

in the feed-up hatch; and (4) the threats by unknown staff members on February 18, 2010.  (*Id.* at 47:16-54:7.)

As was the case with the witnesses that preceded him, Coleman's testimony and declaration are implausible.  Besides the apparent issue—that is, a witness who cannot recall dates or names, despite being provided with a document he prepared just sixty days earlier that includes that information—Coleman's recitation of the misconduct he observed is inconsistent with his declaration, and Tafari's allegations.  By example, Coleman's declaration clearly describes an assault on January 6, 2011, the date Tafari was allegedly beaten by officers while Counselor Boyea told him to drop the lawsuits against Deputy Uhler.  (*See* Dkt. No. 90 at 25.)  Those allegations are in accord with Tafari's claims in 11-cv-1422, as the dates and cell number are the same.  (*Compare id.*, *with* Am. Compl. ¶¶ 4-5, 11-cv-1422.)  However, at the hearing, Coleman painted a different picture.  He began to describe the incident correctly, stating that it was after a cell search, but then, after being asked for specifics, started talking about a tier hearing, then went back to mention Counselor Boyea, and finally, declared that staff, including Deputy Uhler, were present and made threats against Tafari on that day.  (*See* Tr. 48:21-50:14.)  What is remarkable, and

telling about the veracity of Coleman's testimony, is that Tafari does not

allege that Uhler was present, and the only tier hearing Tafari mentions

occurred one month prior to this incident.  (*See generally* Am. Compl., 11-

cv-1422.)

In addition to those contradictions, Coleman's statement on cross-

examination that Tafari was threatened and/or assaulted at "different times,

but almost by the same people," is irreconcilable with both the allegations

and facts in this case.  (Tr. at 56:9-10.)  Given the overwhelming number of

inaccuracies in his testimony and the manner in which he conveyed them,

the court finds Coleman to be wholly incredible, and thus, rejects both his

testimony and declaration.

*4.  James Salamone*

Salamone was an inmate at Upstate from January 27, 2011 until

August 23, 2012.  (*See id.* at 64:10-19.)  He was housed next to Tafari

during his tenure there.  (*See id.* at 64:22-23.)  After refreshing his

recollection with his declarations, (*see* Dkt. No. 90 at 28-30), Salamone

testified that he overheard corrections officers threatening Tafari after a cell

search on September 22, 2011.  (*See* Tr. at 65:3-67:8.)  He further recalled

hearing "nurses" refuse to provide Tafari medical treatment, and observed

26

Tafari return from a court trip in July 2011 with bruises on his face.  (*Id.* at 68:12-69:17.)  Finally, Salamone stated that on more than one occasion he heard Deputy Uhler tell Tafari to "drop the lawsuit."  (*Id.* at 69:23-70:18.)

Unlike the witnesses before him, Salamone's testimony was, for the most part, consistent with his declarations.  (*Compare* Dkt. No. 90 at 28-30, *with* Tr. at 65:3-71:9.)  The primary inconsistency between the two is that Salamone's declaration states that a female nurse refused to treat Tafari, (*see* Dkt. No. 90 at 30), while he testified on direct examination that it was the "heavy set male nurse," whose name he did not know, (Tr. at 68:22-69:7.)  Given the way in which Salamone conveyed this statement, it was clear that he did not simply misspeak.

However, this misstatement, standing alone, is not what marginalized Salamone's testimony.  Rather, it was his deliberate refusal—in his declarations and during his live testimony—to identify the officers or nurses, with the exception of Deputy Uhler, who allegedly mistreated Tafari, that is significant.  (*See* Dkt. No. 90 at 28-30; Tr. at 65:3-71:9.)  Despite being repeatedly asked for the names of the individuals involved, even with respect to non-violative conduct such as escorting Tafari to his cell, Salamone claimed that he either did not know, or could not remember.

27

(*See* Tr. at 67:9-16, 68:22-25, 69:18-22.)  For all of these reasons, the

court finds Salamone's declarations and testimony to be unworthy of belief.

### 5.   Raphael Thompson

Thompson, another inmate at Upstate, principally testified about the

alleged sexual assault that occurred on April 28, 2012.  (*See id.* at 73:6-

78:18.)  Relying on his April 30, 2012 declaration, (*see* Dkt. No. 90 at 31),

Thompson claimed that he saw an officer place his hands "between

[Tafari's] buttocks area," and threaten him that the assault would continue

unless he dropped his lawsuits.  (Tr. at 75:16-77:10.)  Simply put,

Thompson fabricated this story.

This is so because of the inexplicable anomaly on Thompson's

declaration—namely, the inclusion of the consolidated docket number for

the lead case in this matter, 11-cv-694, in the header.  (*See* Dkt. No. 90 at

31.)  Although this court did not consolidate the cases until June 29, 2012,

(*see* Dkt. No. 62), Thompson managed to include the appropriate header,

with the lead case number, on the declaration he supposedly wrote two

months earlier, (*see* Dkt. No. 90 at 31; Tr. at 84:20-22).  Needless to say,

when the court questioned Thompson about this discrepancy, he offered

no plausible explanation.  (*See* Tr. at 84:2-87:21.)  Given his inability to tell

28

the truth, the court rejects Thompson's testimony and declaration.

      *6.    Ralph Bucky Phillips (through David Szalda)*

      David Szalda is a law clerk for Tafari's counsel who took part in a telephone conversation with one of Tafari's witnesses, Phillips.  (*See id.* at 91:6-24.)  Due to security concerns raised by DOCCS, Judge Baxter arranged for Mr. Rench to interview Phillips by telephone.  (*See id.* at 88:19-89:10.)  Mr. Rench did so, and Mr. Szalda transcribed Phillips' answers during that call.  (*See id.* at 91:6-92:22.)  In sum, Phillips testified about events that occurred at Clinton, sometime prior to Tafari's transfer to Upstate.  (*See id.* at 93:16-97:9.)  Though Phillips mentioned Deputy Uhler, he was unable to provide dates, or approximations, for the alleged misconduct.  (*See id.*)  Moreover, he never personally witnessed any physical harm to Tafari.  (*See id.*)  He did, however, state that he overheard Deputy Uhler threaten Tafari once, and knew that Tafari was placed on a restrictive diet for unhygienic conduct.  (*See id.* at 95:13-97:2.)

      In sum, Phillips' testimony has no probative value here, as it occurred at a different correctional facility, at an unknown time.  While he mentioned Deputy Uhler, he provided no specifics of the threat Uhler allegedly made.  (*See id.* at 95:13-95:17.)  Consequently, the court is unable to discern

what, if anything, occurred at Clinton; the connection between the

purported misconduct at Clinton and Upstate; and ultimately, if there was

any, how it demonstrates that Tafari was in imminent danger of serious

physical injury beginning in June 2011.

   7.   InJah Tafari[23]

   Tafari spent a considerable amount of time discussing the eight, or

nine, medical conditions he suffers from.  (*See id.* at 108:15-135:7.)  In so

doing, Tafari reiterated his claim that Dr. Adams discontinued all of his

medical treatments in March 2010—treatments which he was receiving at

his prior facilities, including Clinton.  (*See id.* at 119:3-13.)  However, Tafari

made a contrary assertion in another pending action before the

court—specifically, *Tafari v. Hogan et al.*, 08-cv-1060, the case he claims is

the genesis of the threats by Deputy Uhler, and others.  (*See* Am. Compl. ¶

50, Dkt. No. 10, 08-cv-1060; Tr. at 137:16-19.)  In both his Complaint and

Amended Complaint, filed in October 2008 and February 2009,

respectively, Tafari claims that after he arrived at Clinton in December

2007, Nurse Practitioner Lashaway "discontinued [his] treatments which

---

   [23] In the interest of brevity, the court need not provide an in depth discussion of Tafari's testimony, as it, for the most part, mirrored what he alleged in his twelve Complaints.  (*See* Tr. at 102:6-221:7.)  Instead, the court focuses on the portions of Tafari's testimony that are relevant to evaluating his veracity.

had proven effective . . . in alleviating pain, suffering, recurrence of diseases, dislocating of shoulder and vomiting." (Compl. ¶ 50, Dkt. No. 1, 08-cv-1060; *see* Am. Compl. ¶ 50, 08-cv-1060.) Although his testimony is more explicit, the conditions discussed are the same. (*Compare* Am. Compl. ¶ 50, 08-cv-1060, *with* 2d Am. Compl. ¶ 16 *and* Tr. at 108:15-135:7.) Irrespective of whether the conditions existed, or, if they did, what treatment they required, Tafari's representations to the court on the discontinuance of his medical treatment are irreconcilable.

Beyond this inconsistency, Tafari's testimony was instructive because it demonstrated his vast knowledge of institutional policies and procedures, his understanding of the pertinent law, and his propensity to manipulate his allegations to fit the facts. First, Tafari is well-versed in DOCCS policy and procedure. For example, he not only described the entire inmate grievance program, including its history and exhaustion requirement, (*see, e.g.*, Tr. at 175:12-176:15), but he also explained how photographs are supposed to be taken in conjunction with the filing of a use of force report, (*see id.* at 155:10-18). Furthermore, on more than one occasion, Tafari cited case law to support the point he was trying to make. (*See id.* at 162:14-21, 186:21-187:10, 398:3-5.)

Lastly, Tafari's attention to detail is remarkable.  He not only studied defendants' submissions, but also identified the limits of their proof.  And with those limits in mind, Tafari manipulated his claims, albeit subtly, to avoid running afoul of defendants' evidence.  The hallmark example of this is his attempt to demonstrate the shortcomings in the videotape of the April 28, 2012 strip/frisk.  In his testimony, Tafari added a chronology of the events of that day, which does not appear in his Complaint.  (*Compare* Compl. ¶¶ 5-7, 12-cv-1062, *with* Tr. at 171:17-172:2.)  Although the court recognized that Tafari had done so, it did not, at the time, assign the distinction any unusual significance.  In fact, it was not until Tafari filed a declaration in response to defendants' post-hearing submission that the court appreciated the lengths Tafari will go to further his litigation.

To explain, Tafari's declaration—for the first time—identifies the precise strip cell he was in during the assault, in addition to reiterating the times he testified about.  (*See* Dkt. No. 109 ¶ 5.)  Besides being omitted from his Complaint, (*see* Compl. ¶¶ 5-7, 12-cv-1062), neither the time nor the location are mentioned in Tafari's grievances on the assault, (*see* Dkt. No. 104 at 80-88).  Indeed, in his interview with Lieutenant Laramay on May 30, 2012, Tafari stated that "he could not recall where the alleged

sexual assault occurred." (*See id.* at 71.)  Yet, inexplicably, roughly four months later, after listening to Deputy Uhler's testimony and reviewing defendants' supplemental submission, Tafari was able to recall the exact strip cell that he was in during the assault.  (*See, e.g.*, Tr. at 347:12-18; Dkt. No. 109 ¶ 5.)  This is not a coincidence.  Rather, it is a calculated attempt by Tafari to orchestrate the evidence in his favor.

Finally, in addition to simply adding facts, Tafari offered several colorable, well-articulated explanations to bolster his claims.  Of note, was Tafari's reasoning for refusing a colonoscopy, (*see* Tr. at 129:23-130:7), his explanation of the acoustics at Upstate to prove that inmates inside could hear an assault in the parking lot, (*see id.* at 158:2-8), his knowledge of the camera coverage, or lack thereof, to show why there is no video evidence to corroborate his allegations, (*see id.* at 150:7-12), and the repeated excuses for why neither the grievances nor medical records support his claims, (*see, e.g.*, *id.* at 187:11-23, 209:11-18).[24]  Having observed him on the stand, it was readily apparent that Tafari rehearsed his testimony and

---

[24] On at least one occasion, however, Tafari's explanation of an incident actually undercut a claim.  During his description of the assault in Great Meadow OMH on April 7, 2009, Tafari testified that after he refused to take his medication, the staff "threw [him] on the bed and they stuck [him] in [his] buttocks with a needle." (Tr. at 148:20-25.)  Conveniently, Tafari omitted this explanation from his Complaint in 11-cv-1464, which indicates that the injection was unprovoked.  (*See* Compl. ¶ 7, 11-cv-1464.)

was prepared to counter defendants' challenges.

In sum, the court finds that Tafari's testimony was self-serving, convenient, and ultimately, incredible.  By and large, he avoided outright inconsistencies between his testimony and Complaints, but in doing so, highlighted his willingness to distort the truth or simply disregard it.

### 8.    Stephen Weishaupt

Weishaupt has been a senior investigator with the Inspector General's office of DOCCS for four and a half years.  (*See* Tr. at 223:6-20.) Prior to his employment with DOCCS, Weishaupt was a special agent with the FBI for over twenty years.  (*See id.* at 223:21-24.)  He became familiar with Tafari after being assigned two of his cases in 2009.  (*See id.* at 224:2-7.)  The first case involved the 135 grievances Tafari filed between November 2008 and March 2009, which alleged, among other things, assaults and mistreatment.  (*See id.* at 224:10-14.)  In the course of that investigation, Weishaupt interviewed Tafari, who admitted that "he was writing primarily to aggravate the staff in the facilities," yet maintained that his allegations were true.  (*Id.* at 224:15-225:6.)  Following a "thorough investigation," which included a review of each complaint, the available videotapes, and any records that related to the incidents, Weishaupt could

not find any substantiation for Tafari's assertions.  (*Id.* at 225:10-226:24, 229:3-7.)  Indeed, Weishaupt testified that "several" of Tafari's claims were "completely false."  (*Id.* at 225:17-22.)  But Weishaupt also acknowledged that it was not possible to confirm or deny some of Tafari's allegations, specifically those where an officer supposedly called him a name.  (*See id.* at 225:12-17.)

The second case Weishaupt investigated dealt with Tafari's charge that he was assaulted in the Upstate infirmary and the OMH unit at Great Meadow in April 2009.  (*See id.* at 227:4-12.)  During this investigation, Weishaupt not only interviewed Tafari, but he also reviewed the following: Tafari's medical records; photographs of him; written reports by the accused staff; use of force reports, if there were any; and any available videotapes.  (*See id.* at 227:14-228:1, 239:24-242:2.)  Ultimately, Weishaupt found no evidence, medical or otherwise, to support Tafari's claims.  (*See id.* at 240:21-242:2.)  Although he filed a misbehavior report against Tafari for lying in his complaint to the Investigator General's office, the "ticket" was dismissed because Tafari made similar claims in a grievance.  (*Id.* at 239:2-16.)

In short, the court finds Weishaupt's testimony to be highly credible,

and relevant in evaluating both Tafari's overall propensity for telling the truth, as well as the purported incidents in April 2009.  Among other things, his demeanor on the stand and command of the information he presented both support this finding.

>    *9.    Brandi White*

At the court's request, defendants called White, the Inmate Grievance Program Supervisor at Upstate.  (*See id.* at 244:6-16.)  Although she provided testimony on the grievance program in general, the purpose of White's testimony was to authenticate the grievance records submitted by defendants.  (*See id.* at 244:21-246:23.)  White further testified about the restrictions placed on Tafari for filing excessive grievances, which she estimated was between 400 and 500 over a three-year-period.  (*See id.* at 248:17-254:22.)  However, White was unable to state with certainty the number of Tafari's grievances that allege staff misconduct, or if any of them had ever been substantiated.  (*See id.* at 254:23-255:9.)

In short, the court finds White's testimony entirely credible, though its relevance is limited.  Besides authenticating the grievance records, White provided only background evidence of Tafari's abuse of the grievance program.

10.   *Nancy Smith*

Smith has been with DOCCS for over twenty years, the last nine of which she has served as the Nurse Administrator at Upstate.  (*See id.* at 266:6-267:9.)  In that capacity, Nurse Smith became acquainted with Tafari, as she is responsible for investigating grievances on nurses.  (*See id.* at 267:10-21.)  Given that Tafari grieves about his medical care on a weekly, or bi-weekly basis, Nurse Smith was unable to quantify the number of Tafari's grievances she investigated.[25]  (*See id.* at 267:22-268:3.)  Nevertheless, she provided relevant, credible testimony on her investigations of these grievances, the medical treatment Tafari receives daily, and whether the medical evidence corroborated his claims.

Before discussing her findings, Nurse Smith described the methodology she employs when investigating allegations of misconduct.  (*See id.* at 267:13-21, 270:14-271:2.)  Her first step is to take statements from the nurse(s) named in the grievance, and, if there was a security officer escorting the nurse, she receives that response from the security team as well.  (*See id.* at 270:16-22.)  Next, Nurse Smith personally

---

[25]  Nurse Smith testified, however, that her investigations were unaffected by Tafari's pending litigation against corrections officials, since she had no knowledge of any such lawsuits.  (*See* Tr. at 327:24-328:25.)

interviews the inmate, and in the course of the interview, routinely asks if there is additional information to add to the grievance or if there are witnesses that need to be interviewed.  (*See id.* at 270:22-271:2.) Additionally, on "every" grievance, she reviews the relevant medical records.  (*Id.* at 271:9-14.)  Applying this method to Tafari's innumerable grievances, Nurse Smith testified, after reviewing several of them, that they were unfounded.  (*See generally id.* at 268:11-292:22.)

Moreover, Nurse Smith explained the sick call program that Tafari has access to, and uses, on a daily basis.  (*See, e.g*, *id.* at 272:22-273:12, 323:2-3.)  Relevantly, a nurse evaluating an inmate during sick call is not only required to document every interaction, but also must report any apparent injuries he/she observes—for example, a laceration or black eye—even if that injury is not mentioned on the inmate's sick call slip.  (*See id.* at 273:15-19, 274:1-3.)  To this end, Nurse Smith reviewed Tafari's ambulatory health records on the stand, and found that his records, which covered October 31, 2011 to April 20, 2012, did not reflect that Tafari sustained any injuries from assaultive conduct on any date during that period.  (*See id.* at 274:17-285:3.)

Although Nurse Smith also provided testimony that rebuts Tafari's

claim that he was denied medical treatment for his various ailments,[26] (*see id.* at 285:6-292:22, 296:10-320:21), it was her observations regarding Tafari's filings and motivations that are particularly enlightening.  First, in agreeing that his grievances were "generic," Nurse Smith highlighted that Tafari wrote his grievances in advance, and left blank the name of the nurse and the date of the incident.  (*Id.* at 322:15-24.)  Specifically, she stated: "Every nurse that had an encounter with [Tafari] was getting a grievance on them, and [Tafari] just filled in the blank.  It was Nurse Waterson one day, Nurse Baker one day, and the date just changed.  It was the same grievance."  (*Id.* at 322:20-24.)  Secondly, Nurse Smith echoed Weishaupt's testimony on Tafari's retaliatory motivation in filing grievances when she recounted a discussion she had with him.  (*See id.* at 322:1-14.)  During that conversation, which stemmed from Tafari's accusation that she acted unprofessionally during an investigation, Nurse Smith explicitly told Tafari that she suspected that he was fabricating the stories about the other nurses in his grievances.  (*See id.*)  Rather than denying it, Tafari "blatantly" stated, "[t]he nurses lied [about him], so [he]

---

[26]  For instance, Tafari was observed on more than one occasion "lifting his legal work off the top bunk" and performing other tasks required of him by security, (Tr. at 324:14-22), in spite of the "excruciating pain" he suffers from daily, (*id.* at 142:15-22).

lie[s] about them."[27]  (*Id.* at 322:11-14.)

In sum, Nurse Smith provided unimpeachable testimony that directly spoke to matters in issue.  She neither hesitated nor wavered during her testimony, and, where possible, referenced documents that corroborated her assertions.  Thus, the court is heavily persuaded by her testimony.

### 11.   Donald Uhler

A twenty-eight year veteran of DOCCS, Uhler is currently the Deputy Superintendent for Security Operations at Upstate.  (*See id.* at 330:15-24.) Previously, he was a Captain at Clinton.  (*See id.* at 332:3-8.)  He, like Nurse Smith, is quite familiar with Tafari, from both his time at Clinton, and now at Upstate.  (*See id.* at 340:17-341:22.)  Deputy Uhler testified on a range of subjects, including departmental policy on the use of force, the video recording capabilities at Upstate and his investigations of Tafari's grievances.  (*See id.* at 333:6-358:19.)

With respect to the use of force, Deputy Uhler stated that anytime an officer uses force—that is, when an officer uses direct or indirect contact to "make an inmate do something that he does not wish to do," (*id.* at 372:16-

---

[27]  Indeed, during his direct testimony, Tafari vehemently expressed his displeasure with one of the male nurses, who apparently filed misbehavior reports that had an adverse impact on his chances for parole.  (*See* Tr. at 164:14-23.)

19)—that officer is "bound" to report that force to his supervisor.[28]  (*Id.* at 333:6-16.)  In turn, the onsite supervisor ensures that "medical" sees the inmate, and, at a minimum, that photographs are taken of him.  (*Id.* at 333:19-334:4.)  All of this information is presented to the watch commander and is ultimately submitted to Deputy Uhler's office for review.  (*See id.* at 334:5-14.)  At that time, Deputy Uhler looks over the report, and the video of the event, which is "generally" available.  (*Id.* at 334:13-17.)  Depending on what he finds, Deputy Uhler either submits the report to the Superintendent for final approval, or to the Inspector General's office for additional investigation.  (*See id.* at 334:17-335:12.)  Relevantly, Deputy Uhler knew of only one use of force report that involved Tafari, which was filed after the van incident on February 18, 2010.  (*See id.* at 339:25-340:12.)  However, he found that the force used on that day was "appropriate," and neither the evidence, nor the injuries Tafari sustained, supported his claim of "a severe beating."  (*Id.* at 389:7-391:6.)

A similar procedure is followed if an inmate complains—at anytime, in any manner, to anyone at the facility—that staff mistreated him.  (*See id.* at

_____

[28]  Notably, Weishaupt also testified that he found that "use of force" reports were filed every time they were supposed to be.  (Tr. at 232:10-12.)

41

335:13-337:1, 337:22-338:5.)  No matter when the claim is made, an investigation is immediately commenced; the inmate is removed from his cell; viewed by medical staff, who complete "a one over" and documents any injuries they see, irrespective of whether the injury is new or old; and finally, photographs of at least the inmate's front, back and sides are taken.[29]  (*Id.* at 335:16-336:14.)  The next day, the report is reviewed by Deputy Uhler, and if necessary, forwarded to the Inspector General for further investigation.  (*See id.* at 336:15-21.)

Turning to Upstate's video recording capabilities, Deputy Uhler testified that the system captures audio and video throughout the facility, which is digitally stored on roughly a fourteen-day cycle.  (*See id.* at 345:8-22.)  Unless a specific segment is requested, the footage is unavailable after two weeks.  (*See id.*)  Requests for video are made through Deputy Uhler's office, and are done when there is a use of force, an unusual incident or anytime an inmate "alleges force was used against him . . . [or] a serious act of misconduct."  (*Id.* at 345:24-346:10.)  To this end, Deputy

---

[29]  On cross-examination, Deputy Uhler reiterated that "in the normal course of business" this procedure is followed after an inmate alleges physical abuse.  (Tr. at 365:12-17.)  However, he noted that his staff would not use physical force to compel an inmate to see medical and/or to be photographed.  (*See id.* at 365:25-366:4.)  Furthermore, photographs are not always taken if the inmate makes his allegation "a month after" the incident occurred.  (*Id.* at 365:18-24.)

Uhler requested, and retained, the video of Tafari's strip/frisk on April 28, 2012.  (*See id.* at 347:12-18.)  Contrary to Tafari's claim, Deputy Uhler testified that the video "clearly depicts" that Tafari was not sexually assaulted by Officer Bilow.[30]  (*Id.* at 347:15-18.)

As a consequence of this baseless allegation, Tafari was, for the second time that Deputy Uhler could recall at Upstate, "issued a misbehavior report[] by the Inspector General's office for lying."  (*Id.* at 352:7-11, 353:3-14.)   Not all of Tafari's claims, however, are easily disproved.  Indeed, Deputy Uhler explained that:

> Inmate Tafari is [a] very articulate inmate, very smart, he understands our system very well, he understands that our [video] system is on an approximate [fourteen]-day loop.  Several times, Inmate Tafari would file a grievance that was dated outside that two-week window and then be very upset that we weren't producing the videotapes for him.  Can't produce evidence that doesn't exist anymore.  Also, he would put dates on grievances that he said he filed on a certain date.  And if you look at the grievance stamp, indeed it was received sometime later, so the date—it would be predated . . . so that [it] would be outside the ability for us to retain video evidence of such actions if they did exist.

---

[30]  Despite the evolution in Tafari's testimony regarding the events of April 28, 2012, Deputy Uhler stated, unequivocally, that his investigation of that incident showed that Tafari was "only frisked out one time on that day," and the video he discussed was "the videotape of that frisk, when [Tafari] left the visit room."  (Tr. at 381:15- 382:11.)  While he acknowledged that Tafari may have been "pulled out and talked to" in the strip/frisk area, Deputy Uhler repeated that inmates are only frisked when they leave "their visit at the end of the day and [are] brought back to the cell block."  (*Id.* at 382:5-9.)

(*Id.* at 358:6-19.)  This testimony not only revealed the means Tafari employs to complicate the investigation of his claims, but also demonstrates the disingenuousness in his accusation that defendants' withheld evidence that the court ordered them to produce.  (*See, e.g.*, Dkt. No. 105 at 4-5.)

Although the court studied Deputy Uhler's demeanor, manner and tone throughout his testimony, it paid particular attention to these intangibles when he was questioned about the allegations Tafari lodged against him directly.  Without equivocation, he denied: ever calling an inmate a racial name, (*see* Tr. at 355:15-20.); that he had a "gang" or any knowledge of whom Tafari was referring to, (*id.* at 349:10-14); being responsible for Tafari's transfer to Upstate, as that is a decision made exclusively by "Class of Movement in Albany," (*id.* at 342:16-23); and that he instructed "any employee in the Department of Corrections in [twenty-nine] years" to assault an inmate, (*id.* at 332:18-20).  Additionally, Deputy Uhler stated that he would "never curtail [an] inmate's" ability to grieve, or to access the courts.  (*Id.* at 350:5-12.)  Finally, given his role at Upstate, he too is frequently sued, but is "okay with that."  (*Id.* at 350:20-25.)  To this

end, Deputy Uhler stated:

> I know Mr. Tafari many times has mentioned that everybody, with the exception of maybe the Commissioner, I've told to drop grievances or bad things are gonna happen—or drop lawsuits or bad things are gonna happen. To this day, I can say with [one hundred] percent honesty, I do not know the lawsuit that Inmate Tafari is talking to that he wants me to—that he wanted me tellin' him to drop. I do not know what that lawsuit would be.

(*Id.* at 350:12-19.)

In sum, Deputy Uhler's testimony was both credible and relevant.  He maintained composure throughout, and maintained eye contact with the attorneys, and the court, during his examination.  His answers, unlike Tafari's, were concise and limited to the scope of the question posed.  Most importantly though, the documentary and video evidence is entirely consistent with Deputy Uhler's statements during, and after, the hearing.

## B.   Incidents in Question

Tafari's claims of imminent danger can be separated into two categories: (1) the denial of medical treatment for his various ailments; and (2) the repeated assaults and threats by Upstate staff.  Having reviewed the entire record, the court finds that it is devoid of any evidence that substantiates Tafari's claims.

*1.    Denial of Medical Treatment*

45

With respect to Tafari's various ailments, it is unnecessary to review them one-by-one.  Tafari himself admits that he had these conditions well before he entered Upstate, and according to the unrefuted[31] affidavit of Dr. Richard Adams, the physician at Upstate, none of Tafari's conditions are life threatening.  (*See* Dkt. No. 92, Attach. 1 ¶ 8.)  Notably, Dr. Adams, who has known Tafari since his time at Clinton, stated that he does not suffer from photophobia vision, has not been diagnosed with Raynaud's Disease and "has no indicated risk of developing stomach cancer based upon his complaints of constipation."  (*Id.* ¶¶ 5, 9-12, 17.)  Although Tafari desires additional treatments, such as narcotics for pain, those treatments are not warranted.  (*See id.* ¶¶ 14, 22.)  Dr. Adams further denied that he withheld any medically necessary treatment from Tafari, nor would he do so at the request of other medical personnel.  (*See id.* ¶ 20.)  In sum, he averred that Tafari has, and continues, to receive proper care and "has never been . . . in imminent danger arising out of any long standing or current medical

---

[31]  Tafari produced three declarations/affidavits from other inmates that discussed the special diets they receive for religious reasons; he likely did so to further his claim that he is denied vegetarian meals.  (*See* Dkt. No. 90 at 4-8.)  However, absent the case where an inmate was allergic to a food, or being outright starved—neither of which is even alleged here—the court is unable to discern the relevance of this evidence.  Likewise, the declaration/affidavits from Samuel Edmonson, Ellis Douglas, Mark Braun and Nicholas Ippolito are also immaterial, as they address, using virtually identical language, an isolated incident in October 2009—just short of two years before the first Complaint was filed—where Tafari was purportedly denied access to an OMH program. (*See id.* at 9-13.)

condition." (*Id.* ¶¶ 21, 23.)

Dr. Adams' affidavit is conclusive proof of three things.  First, that Tafari lied on the stand when he stated he suffered from photophobia vision and Raynaud's Disease. (*See* Tr. at 109:10, 110:18-23.)  Second, that Tafari's ailments do not place him in imminent danger of serious physical harm.  And third, that Tafari is not being denied medical treatment. Indeed, the volumes of medical records the court received demonstrate that Tafari is afforded daily medical care via nurse sick call, (*see generally* Dkt. No. 78), is receiving all medically necessary treatments, (*see* Dkt. No. 89, Attach. 5 at 2-5), and has been offered—though he does not always accept, (*see, e.g.*, Tr. at 306:9; Dkt. No. 78 at 90-95)—any additional treatments that are required, (*see, e.g.*, Dkt. No. 78, Attachs. 1-3).

### 2.  *Misconduct by Upstate Staff*

Through an exhaustive review of Tafari's Complaints and testimony—which were not entirely consistent, (*see*, *e.g.,* Tr. at 369:13-22)—the court identified thirty-seven dates on which Tafari contends he was either threatened or assaulted.  Although there was one instance where force was used on Tafari, there was no credible evidence to support any of Tafari's claims.  In the interest of clarity, the court will review its

47

findings date-by-date, articulating, where possible, the evidence that is

relevant to the particular date.

> (1) <u>March 31, 2009</u>: Tafari claims he was assaulted on this
> date. (*See* Tr. at 144:18.)  His medical records do not support
> his claim, as there are no medical complaints on his intake
> form, and no injuries observed on his ambulatory health
> records on March 31 or April 1. (*See* Dkt. No. 89, Attach. 1 at
> 2-3.)  Moreover, Tafari's grievance on this incident was denied
> because no evidence was found to support his allegations, and
> the staff member he named denied any misconduct. (*See* Dkt.
> No. 89, Attach. 5 at 25-32.)

> (2) <u>April 7, 2009</u>: Tafari alleges he was assaulted on this date.
> (*See* Tr. at 147:10-148:8.)  There is no credible evidence to
> substantiate that claim.

> (3) <u>April 13, 2009</u>: Tafari alleges he was assaulted on this
> date. (*See id.* at 149:7-9.)  Deputy Superintendent Sheahan
> investigated this incident and found no evidence of staff
> misconduct. (*See* Dkt. No. 104 at 9-15, 24-50.)  There is no
> other credible evidence to substantiate this claim.

> (4) <u>April 20, 2009</u>:  Tafari alleges he was assaulted on this
> date. (*See* Tr. at 149:25-151:14.)  This claim was the subject of
> Investigator Weishaupt's second investigation, at the
> conclusion of which he determined the allegations were
> unfounded. (*See supra* Part IV.A.8.)  Deputy Superintendent
> Sheahan also found no evidence of staff misconduct. (*See* Dkt.
> No. 104 at 9, 24.)  Furthermore, Tafari's ambulatory health
> record on the next day shows no evidence of assaultive
> conduct, and states that Tafari did not even request sick call on
> that day. (*See* Dkt. No. 78 at 82.)  There is no other credible
> evidence to substantiate this claim.

> (5) <u>April 24, 2009</u>: Tafari alleges he was assaulted on this

date.  (*See* Tr. at 151:23-153:20.)  This claim was also deemed baseless by Investigator Weishaupt and Deputy Superintendent Sheahan.  (*See supra* Part IV.A.8; Dkt. No. 104 at 9, 24.)  In addition, Tafari was on suicide watch until 4:45 P.M. on April 24; the notes of that watch do not support his claim.  (*See* Dkt. No. 75, Attach. 4 at 14-16.)  Finally, there is no evidence of assaultive conduct on his April 26 ambulatory health record. (*See* Dkt. No. 89, Attach. 2 at 18.)  There is no other credible evidence to substantiate this claim.

(6)  December 12, 2009: Tafari alleges he was threatened by Officer Bilow on this date.[32]  (*See* Am. Compl. ¶ 8, 11-cv-1342.) There is no credible evidence to substantiate that claim.

(7)  December 26, 2009: Tafari alleges he was threatened by Officer Bilow on this date.  (*See id.* ¶ 10.)  There is no credible evidence to substantiate that claim.

(8)  January 8, 2010: Tafari alleges he was threatened by Officer Bilow on this date.  (*See id.* ¶ 12.)  There is no credible evidence to substantiate that claim.

(9)  February 6, 2010:  Tafari alleges he was threatened by Officer Bilow on this date.  (*See id.* ¶ 13.)  There is no credible evidence to substantiate that claim.

(10)  February 18, 2010: Tafari alleges that he sustained an unprovoked attack in the van on the way to Ulster County Supreme Court, and suffered multiple injuries, including: a broken nose, broken ribs, two black eyes, lacerations on his head and lower leg, and bruises on his face, chest, stomach, legs, shoulders and arms.  (*See id.* ¶¶ 14-17, 21.)  The report filed on this incident does not support Tafari's claims. Immediately after the incident, Nurse Gordon noted that Tafari

---

[32] Inexplicably, Tafari did not seek to call Officer Bilow, or any other of the named defendants who allegedly committed misconduct, at the hearing.  (*See* Dkt. Nos. 69, 71, 83.)

was able to remove his clothes, bend down and remove his boots and follow commands.  (*See* Dkt. No. 75, Attach. 3 at 7.)  Tafari had a red mark on the top of his shoulder and superficial scrapes on the top of his left hand.  (*See id.*)  After his spit mask was removed, Nurse Gordon noted that Tafari had minor facial injuries.  (*See id.* at 20.)  A subsequent examination, which included x-rays, revealed only a fracture of the right tenth rib.  (*See* Dkt. No. 78 at 70.)  Moreover, the officers involved each stated that Tafari was the instigator, and force was only used to subdue him.  (*See, e.g.*, Dkt. No. 75, Attach. 3 at 5, 10-16.)  Ultimately, the force used was deemed necessary by the Superintendent.  (*See id.* at 9.)

(11)  July 23, 2010:  Tafari alleges that Nurse Baker slammed his hand in the feed hatch on this date.[33]  (*See, e.g.,* 2d Am. Compl. ¶ 20.)  However, his ambulatory health record for that day shows no evidence of swelling or injury to his hand.  (*See* Dkt. No. 78 at 68.)  There is no other credible evidence to substantiate this claim.

(12)  July 27, 2010: Tafari alleges he was threatened by Officer Bilow on this date.  (*See* Am. Compl. ¶ 26, 11-cv-1342.)  There is no credible evidence to substantiate that claim.

(13)  December 16, 2010: Tafari alleges that he was assaulted after his tier hearing on this date, and suffered injuries to his legs, chest, stomach, arms, face, back and head.  (*See* Compl. ¶¶ 4, 7, 11-cv-1429.)  However, Tafari did not report any of these injuries during nurse sick call on December 17, and no evidence of assaultive conduct was reported on his ambulatory health record either.  (*See* Dkt. No. 89, Attach. 3 at 78.)  There is no other credible evidence to substantiate this claim.

(14)  December 21, 2010: Tafari alleges that he was assaulted

---

[33]  Tafari did not include Nurse Baker on any witness lists, (*see* Dkt. Nos. 69, 71, 83), and explicitly stated that he did not want to call him as a witness during the pre-hearing conference on August 23, 2012.

by Upstate staff on this date.  (*See* Am. Compl. ¶ 13, 12-cv-269.)  However, Tafari did not report any injuries, besides his chronic shoulder pain, on either December 21 or 22, and there is no evidence of assaultive conduct in his ambulatory health records for those days either.  (*See* Dkt. No. 89, Attach. 3 at 80.)  Moreover, in his grievance dated December 21, 2010, Tafari makes no mention of the assault, though he did claim that Deputy Uhler threatened him sometime that day.  (*See* Dkt. No. 104 at 215.)  Following an investigation, the grievance was deemed baseless.  (*See id.* at 214.)  There is no other credible evidence to substantiate this claim.

(15)  January 1, 2011: Tafari alleges he was threatened by Officer Bilow on this date.  (*See* Am. Compl. ¶ 27, 11-cv-1342.)  There is no credible evidence to substantiate that claim.

(16)  January 6, 2011: Tafari alleges that he suffered multiple injuries, including broken ribs, black eyes and a swollen face after he was assaulted by several officers.  (*See, e.g.*, Am. Compl. ¶¶ 4-6, 11-cv-1422.)  None of the injuries Tafari claims to have sustained were reported during nurse sick call on either January 6 or 7, and there is no evidence of assaultive conduct in his ambulatory health records for those days either.  (*See* Dkt. No. 89, Attach. 3 at 85-86.)  There is no other credible evidence to substantiate this claim.

(17)  January 12, 2011: Tafari alleges that he was assaulted by Upstate staff on this date.  (*See* Am. Compl. ¶ 13, 12-cv-269.)  However, Tafari did not report any injuries, besides his chronic shoulder pain, on either January 12 or 13, and there is no evidence of assaultive conduct in his ambulatory health records for those days either.  (*See* Dkt. No. 78 at 57.)  Moreover, in his grievance dated January 20, 2011, Tafari makes no mention of an assault on January 12.  (*See* Dkt. No. 89, Attach. 5 at 36-42.)  There is no other credible evidence to substantiate this claim.

(18)  <u>March 31, 2011</u>: Tafari alleges that he was assaulted by Upstate staff on this date.  (*See* Am. Compl. ¶ 13, 12-cv-269.)  However, Tafari refused sick call on this day, and the next; nevertheless, there is no evidence of assaultive conduct on his ambulatory records for either day.  (*See* Dkt. No. 89, Attach. 3 at 119.)  There is no other credible evidence to substantiate this claim.

(19)  <u>April 17, 2011</u>: Tafari alleges that Nurse Baker slammed his hand in the feed hatch on this date.  (*See* 2d Am. Compl. ¶ 20.)  However, Tafari did not report any injuries during nurse sick call on either April 17 or 18, and no evidence of assaultive conduct was reported in the records.  (*See* Dkt. No. 89, Attach. 3 at 125-26.)  There is no other credible evidence to substantiate this claim.

(20)  <u>July 26, 2011</u>: Tafari alleges Officer King and Sergeant Gettman watched Officer Rushlow assault him during his trip to Wende.  (*See* Compl. ¶¶ 4-6, 11-cv-1446.)  The investigation of Tafari's grievance for this incident uncovered no evidence to support his claim.  (*See* Dkt. No. 89, Attach. 5 at 57-62.)  And, the staff involved denied the allegation.  (*See id.* at 61.)  Moreover, Tafari did not report any injuries during nurse sick call on July 28, and no evidence of assaultive conduct was reported on his ambulatory health record.  (*See* Dkt. No. 78 at 47.)  There is no other credible evidence to substantiate this claim.

(21)  <u>September 2, 2011</u>: Tafari alleges that Nurse Baker slammed his hand in the feed hatch on this date.  (*See* 2d Am. Compl. ¶ 20.)  The investigation of Tafari's grievance for this incident uncovered no evidence to support his claim, and Nurse Baker denied the allegation.  (*See* Dkt. No. 104 at 91, 94-97.)  There is no other credible evidence to substantiate this claim.

(22)  <u>September 22, 2011</u>: Tafari alleges that Officer Ferrick, and others, assaulted him after conducting a cell frisk on this

date.  (*See* Am. Compl. ¶¶ 5-7, 12-cv-662; Tr. at 170:18-171:10.)  The investigation of Tafari's grievance for this incident—which did not mention that he was assaulted—uncovered no evidence to support his claim.  (*See* Dkt. No. 89, Attach. 5 at 71-74.)  Additionally, the staff involved denied the allegation.  (*See id.* at 73.)  Moreover, Tafari did not report any injuries during nurse sick call on September 23, and no evidence of assaultive conduct was reported on his ambulatory health record.  (*See* Dkt. No. 89, Attach. 4 at 4.)  There is no other credible evidence to substantiate this claim.

(23)  October 17, 2011: During his trip to Auburn on this date, Tafari alleges that Sergeant Gettman threatened him.  (*See* Compl. ¶ 11, 11-cv-1446.)  Sergeant Gettman denied the allegation, and the investigation of Tafari's grievance uncovered no evidence to support his claim.  (*See* Dkt. No. 76, Attach. 11.)  There is no other credible evidence to substantiate this claim.

(24)  November 13, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See* 2d Am. Compl. ¶ 22.)  There is no credible evidence to substantiate that claim.

(25)  November 20, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See* 2d Am. Compl. ¶ 22.)  Tafari filed a grievance that included this allegation.  (*See* Dkt. No. 77, Attach. 5 at 1-2.)  That grievance was ultimately denied, as there was no evidence to support Tafari's claim, and the staff involved denied any misconduct.  (*See id.*)  There is no other credible evidence to substantiate this claim.

(26)  November 21, 2011: Tafari alleges he was threatened by Deputy Uhler on this date.  (*See* Am. Compl. ¶ 14, 12-cv-269.)  There is no credible evidence to substantiate that claim.

(27)  November 27, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See* 2d Am. Compl. ¶ 22.)  There is

no credible evidence to substantiate that claim.

(28)  December 4, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See id.*)  Tafari filed a grievance that included this allegation.  (*See* Dkt. No. 77, Attach. 8.)  That grievance was ultimately denied, as there was no evidence to support Tafari's claim, and the staff involved denied any misconduct.  (*See id.*)  There is no other credible evidence to substantiate this claim.

(29)  December 18, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See* 2d Am. Compl. ¶ 22.)  There is no credible evidence to substantiate that claim.

(30)  December 25, 2011: Tafari alleges he was threatened by Nurse Baker on this date.  (*See id.*)  There is no credible evidence to substantiate that claim.

(31)  January 8, 2012: Tafari alleges he was threatened by Nurse Baker on this date.  (*See id.*)  There is no credible evidence to substantiate that claim.

(32)  January 22, 2012: Tafari alleges he was threatened by Nurse Baker on this date.  (*See id.*)  There is no credible evidence to substantiate that claim.

(33)  January 30, 2012: Tafari alleges he was threatened by Deputy Uhler on this date.  (*See* Am. Compl. ¶ 15, 12-cv-269.)  There is no credible evidence to substantiate that claim.

(34)  February 15, 2012: Tafari alleges that he was assaulted by Upstate staff on this date.  (*See id.* ¶ 13.)  However, Tafari did not report any injuries during nurse sick call on either February 15 or 16, and no evidence of assaultive conduct was reported in his ambulatory health records either.  (*See* Dkt. No. 78 at 29.)  There is no other credible evidence to substantiate this claim.

(35)  April 28, 2012: Tafari claims he was threatened by Officer Ramsdell and then sexually assaulted by Officer Bilow during a strip/frisk.  (*See, e.g.*, Compl. ¶¶ 4, 7, 12-cv-1062.)  After a comprehensive investigation into the grievances Tafari filed regarding this incident,[34] which included interviews with Tafari, the staff involved and a review of the video[35] for Tafari's exit strip/frisk, the grievance was determined to be baseless.  (*See* Dkt. No. 104 at 52-69, 71-88.)  Moreover, Tafari did not report any injuries during nurse sick call on April 29.  (*See* Dkt. No. 78 at 13.)  Finally, he refused to be examined by the medical staff investigating this incident on June 5, however, a rectal exam on June 11 was unremarkable.  (*See* Dkt. No. 89, Attach. 5 at 80-81.)  There is no other credible evidence to substantiate this claim.

(36)  May 5, 2012: Tafari alleges that he was assaulted by Officer Bilow on this date.  (*See* Am. Compl. ¶ 28, 11-cv-1342.)  However, Tafari reported only chronic shoulder pain during nurse sick call on May 5 and 6, and no evidence of assaultive conduct was reported in his ambulatory health records either.  (*See* Dkt. No. 78 at 9.)  There is no other credible evidence to substantiate this claim.

(37)  June 16, 2012: Tafari alleges he was threatened by Officer Bilow on this date.  (*See* Compl. ¶ 12, 12-cv-1062.)  There is no credible evidence to substantiate that claim.

## C.   **Summary of Findings**

In sum, Tafari failed to produce a scintilla of credible evidence that

---

[34]  Notably, Tafari's initial grievance on this incident, which was received on May 2, 2012, did not include allegations of sexual assault.  (*See* Dkt. No. 104 at 53-55.)  It was not until a month later that Tafari added his claim that Officer Bilow penetrated him.  (*See id.* at 80-81.)

[35]  Having viewed the video of this incident, it is beyond reproach that Tafari's allegations are untrue.  (*See* Dkt. No. 104, Ex. E.)

corroborates any of his allegations.  Instead, he manufactured his

testimony, and that of his witnesses, in an attempt to further his litigation.

Moreover, when faced with incontrovertible evidence that disproved his

claims, Tafari simply changed his story or offered additional details.  On the

contrary, defendants produced volumes of records that either discredit or

disprove Tafari's complaints.  Given Tafari's disregard for the oath he

swore when he took the stand, and his clear repudiation of his obligations

under the Federal Rules of Civil Procedure when he signed his Complaints,

the court finds that he is wholly incredible.  *See* Fed. R. Civ. P. 11(b).  It

follows that his allegations of imminent danger of serious physical injury are

baseless, as they have no evidentiary support, nor will they have such

support "after a reasonable opportunity for further investigation or

discovery."  Fed. R. Civ. P. 11(b)(3).

## V. Discussion

To avoid imposition of the three strikes rule, Tafari offered two

separate, but related arguments.  The first of which is that his serious

medical conditions, coupled with the denial of treatment, place him in the

requisite danger.  (*See* Dkt. No. 112 at 4-20.)  And the second is that the

pattern of threats and assaults he has been subjected to satisfies the

standard set forth by the Circuit in *Chavis*, 618 F.3d at 170.  (*See* Dkt. No. 9 at 1, 12-cv-269.)  In short, the court disagrees.

To support his first argument, Tafari cites, *inter alia*, case law addressing the deliberate indifference standard under the Eighth Amendment, and an Eleventh Circuit case where the prisoner was found to be in imminent danger after he was denied medication for HIV and hepatitis.  (*See* Dkt. No. 112 at 15-20); *Brown*, 387 F.3d at 1349-50.  His reliance on these theories is misplaced.  The question here is not whether Tafari has stated a claim, but whether he should be permitted to do so without paying the statutory filing fee.  Furthermore, his conditions, at least those that he actually suffers from, are neither imminent, nor comparable to the conditions cited in *Brown*—for example, HIV and hepatitis.  While Tafari may be in discomfort, the court concludes that as a matter of law, he is not in imminent danger of serious physical harm as a result of his medical conditions.[36]  Equally untenable is Tafari's second argument regarding the pattern of staff misconduct, which the court has already found does not exist.

---

[36] Even if there was not uncontested medical proof to refute his claim, Tafari still could not satisfy the imminent danger standard since he suffered from these conditions for *at least* three years before he commenced the lead case, and there is no evidence that the conditions have progressed.

It follows that because Tafari was not in imminent danger at the time he filed any of his twelve Complaints, he may not proceed with these cases unless he pays the statutory filing fee within thirty (30) days of the date of this Memorandum-Decision and Order.  Tafari is further advised that these cases are no longer consolidated, which means that in order to proceed with a particular case, he must first pay the fee in that case.

## VI. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Clerk is directed to docket this Memorandum-Decision and Order in the following member cases: 9:11-cv-1342; 9:11-cv-1390; 9:11-cv-1422; 9:11-cv-1429; 9:11-cv-1446; 9:11-cv-1447; 9:11-cv-1464; 9:11-cv-1476; 9:12-cv-269; 9:12-cv-662; and 9:12-cv-1062; and it is further

**ORDERED** that the consolidation orders (Dkt. Nos. 62, 64) are **RESCINDED**; and it is further

**ORDERED** that the stay is lifted in each of the consolidated cases; and it is further

**ORDERED** that Tafari's motions to amend his Complaints (Dkt. No. 50, 11-cv-694; Dkt. No. 11, 11-cv-1342; Dkt. No. 9, 11-cv-1422; Dkt. No.

58

10, 12-cv-269; Dkt. No. 7, 12-cv-662) are **GRANTED** and his Amended

Complaints are deemed filed immediately; and it is further

    **ORDERED** that the Clerk is directed to terminate the pending R&R in

12-cv-269 (Dkt. No. 8) as it is moot; and it is further

    **ORDERED** that Tafari's motions for leave to amend his Complaints

(Dkt. No. 107, 117) are **DENIED**; and it is further

    **ORDERED** that Tafari's requests for an extension of time to further

supplement the record (Dkt. Nos. 112, 113, 116) are **DENIED**; and it is

further

    **ORDERED** that, pursuant to 28 U.S.C. § 1915(g), Tafari's IFP status

is **REVOKED** in 11-cv-694, 11-cv-1390, 11-cv-1446, 11-cv-1429, 11-cv-

1447, 11-cv-1464, 11-cv-1476; and it is further

    **ORDERED** that, pursuant to 28 U.S.C. § 1915(g), Tafari's motions to

proceed IFP are **DENIED** in 11-cv-1342 (Dkt. Nos. 2, 5); 11-cv-1422 (Dkt.

No. 2); 12-cv-269 (Dkt. No. 2); 12-cv-662 (Dkt. No. 2); 12-cv-1062 (Dkt. No.

2); and it is further

    **ORDERED** that unless Tafari pays the $350.00 filing fee <u>in each of</u>

<u>the twelve cases</u>, within thirty (30) days of the date of this Memorandum-

Decision Order, that case will be **DISMISSED**; and it is further

**ORDERED** that if Tafari fails to pay the $350.00 filing fee in a particular case, the Clerk, without further order of the court, shall enter judgment for defendants and close that case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

October 31, 2012
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court

60